# STATE OF LOUISIANA
## COURT OF APPEAL, THIRD CIRCUIT

### 13-181

ADRIEN BAUDOIN, ET AL.

VERSUS

THOMAS B. PUTNAM, ET AL.

**\*\*\*\*\*\*\*\*\*\***

APPEAL FROM THE
FIFTEENTH JUDICIAL DISTRICT COURT
PARISH OF VERMILION, NO. 93477-G
HONORABLE DURWOOD WAYNE CONQUE, DISTRICT JUDGE

**\*\*\*\*\*\*\*\*\*\***

**SHANNON J. GREMILLION**
**JUDGE**

**\*\*\*\*\*\*\*\*\*\***

Court composed of James T. Genovese, Shannon J. Gremillion, and John E. Conery, Judges.

**AFFIRMED.**

**Steven Gerald Durio**
**Travis J. Broussard**
**Durio, McGoffin, Stagg & Ackermann**
**P. O. Box 51308**
**Lafayette, LA 70505-1308**
**(337) 233-0300**
**COUNSEL FOR PLAINTIFFS/APPELLANTS:**
  **Adrien Baudoin**
  **Michael Meaux**
  **Erich G. Loewer, Jr.**
  **Chad Vice**
  **Bruce Webb**

Tracy Peter Curtis
Lewis Brisbois Bisgaard & Smith, L.L.P.
100 E. Vermillion, Ste. 300
Lafayette, LA 70501
(337) 326-5777
**COUNSEL FOR DEFENDANTS/APPELLEES:**
George A. Putnam
Thomas B. Putnam
Emmet P. Putnam, III

**GREMILLION, Judge.**

The plaintiff/appellants, Adrien Baudoin, Erich G. Loewer, Jr., Michael Meaux, Chad Vice, and Bruce Webb, appeal the judgment in their employment dispute dismissing their demands against Thomas B. Putnam, George A. Putnam, and Emmet P. Putnam, III. For the reasons that follow, we affirm.

## FACTS AND PROCEDURAL HISTORY

George Putnam and his brother, Emmet, founded Abbeville Lumber Company (ALC). One of ALC's enterprises was the construction, sale, leasing, and refurbishment of offshore living quarters. This business proved so lucrative, in fact, that in 1997 ALC spun-off the offshore quarters business and created Abbeville Offshore Quarters, Inc. (AOQ). The brothers also brought George's son, Thomas B. Putnam, in as a one-third shareholder of AOQ. At the time AOQ was started, Baudoin, Meaux, and Vice were employees of ALC and became employees of AOQ. Loewer was a CPA practicing in Abbeville. His practice became increasingly consumed with AOQ's business, and before long, it made more sense for him to be hired as a full-time employee, so he became AOQ's chief financial officer. Webb began working for AOQ in 2005, and his wife had worked there before him.

The elder Putnams were nearing retirement around 2000. Thomas knew he would not be able to buy the shares of his father and uncle, so AOQ hired a business valuation firm. In the latter half of 2005, the Putnams received an offer from Stallion Offshore. They engaged in negotiations over some period of time thereafter.

AOQ held an annual fishing rodeo Memorial Day weekend. At that gathering in 2006, some of the plaintiffs were asked about Stallion's purchase of

AOQ. They confronted Thomas Putnam (hereafter Putnam) about this, and Putnam scheduled a meeting in Abbeville for Memorial Day, at which he told them that a sale to Stallion was in the works.[1]

Loewer approached Putnam about bonuses for the "key employees," such as himself, Baudoin, Meaux, Vice, Webb, and Marty Gutierrez. Loewer did this because, he testified, "I've done a number of acquisitions and dispositions in my career, and my experience has always been that people would pay bonuses when it was a good sale, if you will. Not a fire sale, of course." He initially approached Putnam with a four-tiered bonus structure based upon an employee's "grade" with an "A" meriting a $200,000 bonus and an "F" meriting a mere $50,000 bonus. According to Loewer, Putnam's response was "non-committal." Later, when approached by Loewer, Putnam indicated that he and his uncle were considering a lesser figure of $150,000. Putnam repeated this figure to Webb.

Putnam, during the course of negotiating with Stallion, arranged for Stallion to offer plaintiffs two-year employment contracts. These contracts were made part of and a condition of the sale of the Putnams' stock. Stallion, however, insisted that the employment contracts contain two-year non-compete agreements. Webb was reluctant to sign because of the non-compete clause. However, all plaintiffs eventually signed the agreement. The sale of the Putnams' stock to Stallion was perfected in 2006.

To celebrate the sale, Putnam held a party at his home. At the party, Putnam gave envelopes to the plaintiffs. Baudoin, Loewer, Meaux, and Vice each received two checks totaling $75,000; Webb's two checks totaled $50,000. These checks

---

[1] We limit our discussions to Thomas Putnam because there is no testimony of any communications between George or Emmet Putnam and the plaintiffs. Emmet signed a check that was delivered to each plaintiff.

2

represented half the amount that they thought they were to receive. No one questioned Putnam at the time, but later discussions revealed that Putnam intended to pay half at the time of the sale and half after an initial public offering (IPO) of Stallion's stock, which represented at least forty percent of the payment to the Putnams.

Unfortunately for all involved, Stallion declared bankruptcy. The Putnams' stock thus became worthless, and no IPO was held.

In February 2008, Loewer was terminated by Stallion. He filed suit against Putnam and Stallion. Stallion settled with Loewer, who claimed that he was owed the remainder of the salary that would have been owed him under the two-year employment contract. A trial was held in Loewer's suit against Putnam and resulted in a judgment in favor of Loewer for $25,000.

Thereafter, Loewer and the other plaintiffs filed suit against the Putnams collectively to recover the remaining half of the bonus they claim is owed them. Trial was held before the bench alone, and the trial court found in favor of the Putnams as to the claims of all plaintiffs. The trial court found that the promise of $150,000 was a gratuitous obligation conditioned on the Stallion IPO, and when the IPO fell through, the condition became impossible and extinguished the obligation. This appeal followed.

## ASSIGNMENTS OF ERROR

Appellants assert that the trial court committed manifest error in finding that the bonuses were conditioned on the Stallion IPO and in finding that Thomas Putnam did not obligate Emmet and George Putnam through mandate.

3

**ANALYSIS**

"A contract is gratuitous when one party obligates himself towards another for the benefit of the latter, without obtaining any advantage in return." La.Civ.Code art. 1910. Gratuitous contracts are enforceable. The existence of a contract is a question of fact. *Cloud v. Warner*, 157 La. 14, 101 So. 794 (La.1924). Determinations of questions of fact are reviewed under the manifest error standard, which requires that the court of appeal review the entire record to determine not whether the trial court was right or wrong, but whether the trial court's factual determination is reasonably supported therein. *Stobart v. State through Dep't of Transp. & Dev.,* 617 So.2d 880 (La.1993).

Appellants do not question the trial court's determination that the bonuses represent a gratuitous contract. The Putnams contend that the bonuses were gifts.

The trial court found that it was not clear that an amount was agreed to before the sale of the AOQ stock to Stallion, except in the case of Webb, who personally held discussions with Putnam and was assured that he would receive a bonus of $100,000. Putnam initially rejected the graded bonus proposed by Loewer. The trial court determined that the offer of a bonus was conditioned on the sale of the stock to Stallion and that payment of one-half of the amounts discussed by Putnam as a potential bonus served as an acknowledgement of that gratuitous obligation. The bonuses were intended as a way of the Putnams thanking plaintiffs for their years of service and were not an inducement or incentive for plaintiffs to execute the Stallion contracts of employment.

The testimony lends reasonable support to the trial court's factual findings. Loewer testified that Putnam was thinking about a bonus of $150,000. No other witness besides Webb actually talked to Putnam about the bonuses. The others

4

relied on Loewer, who seems to have made assumptions that did not materialize. Loewer initially approached Putnam about the bonuses because his experience with other acquisitions was that key employees were rewarded for their service by outgoing ownership.

No witness related the issue of bonuses to an incentive for executing the employment contracts with Stallion. Only Webb testified to any reluctance to sign the contract.

Our review of the record convinces us that the trial court did not err in its factual findings. There are three permissible views of the evidence. The first is that there was never a firm agreement by Putnam that AOQ would pay anything. Putnam's only response to the request for bonuses was that he was considering $150,000 bonuses for all except Webb.

The second permissible view of the evidence is that of the plaintiffs. They accept Loewer's position that Putnam did not equivocate and clearly offered the bonuses.

The third permissible view is that adopted by the trial court. Putnam agreed that he was considering the sums mentioned, but only paid half because those amounts were conditioned on the receipt of the Putnams of an amount they ultimately did not receive.

When there are permissible alternative interpretations of the evidence, the trial court's adoption of one of those alternatives can never constitute manifest error. *Stobart*, 617 So.2d 880. The trial court did not manifestly err in finding that the offer of the bonuses was subject to the suspensive condition of the Stallion IPO.

The Louisiana Civil Code addresses conditional obligations. "A conditional obligation is one dependent on an uncertain event." La.Civ.Code art. 1767.

5

Further, "[i]f the obligation may not be enforced until the uncertain event occurs, the condition is suspensive." *Id.* The exception to the rule that an obligation subject to a suspensive condition may not be enforced until the uncertain event occurs is found in La.Civ.Code art. 1772, which provides, "A condition is regarded as fulfilled when it is not fulfilled because of the fault of a party with an interest contrary to the fulfillment." Putnam was not shown to have played any part in the failure of the Stallion IPO. "If no time has been fixed for the occurrence of the event, the condition may be fulfilled within a reasonable time. Whether or not a time has been fixed, the condition is considered to have failed once it is certain that the event will not occur." La.Civ.Code art. 1773.

The suspensive condition of the Stallion IPO is certain to not occur. The trial court correctly applied the law of conditional obligations to the facts of the case.

Because we affirm the trial court's ruling in favor of the defendants on the plaintiffs' first assignment of error, plaintiffs' second assignment of error, that George Putnam and Emmet Putnam should have been found obligated as well as Thomas, has been rendered moot.

For the foregoing reasons, we affirm the judgment in favor of Thomas B. Putnam, George A. Putnam, and Emmet P. Putnam, III. All costs of this appeal are taxed to plaintiffs/appellants, Adrien Baudoin, Erich G. Loewer, Jr., Michael Meaux, Chad Vice, and Bruce Webb.

**AFFIRMED.**